# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF WASHINGTON
# AT SEATTLE

DAVID RICHARD DANCE,

    Petitioner,

    v.

UNITED STATES OF AMERICA,

    Respondent.

CASE NO. C17-0156RSM

ORDER DENYING PETITIONER'S MOTION UNDER 28 U.S.C. § 2255 TO VACATE, SET ASIDE, OR CORRECT SENTENCE BY A PERSON IN FEDERAL CUSTODY

## I. INTRODUCTION

Before the Court is Petitioner's 28 U.S.C. § 2255 Motion to Vacate, Set Aside, or Correct Sentence. Dkt. # 1. Petitioner David Richard Dance challenges the 48-month sentence imposed on him by this Court after he pleaded guilty to one count of Wire Fraud in violation of 18 U.S.C. § 1343. *USA v. Dance*, CR15-0349RSM at Dkts. #6, #10 and #17. Petitioner now challenges his sentence on the basis of ineffective assistance of counsel. Dkt. #1 at 2-12. The Government opposes the motion, arguing that Petitioner has failed to prove an ineffective assistance of counsel claim. Dkt. #9. The Court has determined that no evidentiary hearing is necessary. *See* 28 U.S.C. § 2255(b). After full consideration of the record, and for the reasons set forth below, the Court DENIES Petitioner's § 2255 motion.

## II. BACKGROUND

On November 2, 2015, Petitioner entered into a plea agreement wherein he agreed to plead guilty to one count of Wire Fraud in violation of 18 U.S.C. § 1343. CR15-0349RSM at

ORDER
PAGE - 1

Dkt. #6. The agreement set forth the following elements of his crime: 1) that defendant devised a scheme to defraud or to obtain money or property by means of false or fraudulent pretenses, representations or promises; 2) that the statements made or facts omitted as part of the scheme were material; 3) that defendant acted with the intent to defraud, that is, the intent to deceive or cheat; and 4) that the defendant used, or caused to be used, an interstate wire communication to carry out or attempt to carry out an essential part of the scheme. *Id.* at 2. As part of the agreement, Petitioner agreed that he was guilty of the charged offense, and agreed to the following facts:

> From March 2005 through January of 2012, Defendant was the sole managing member and president of 1031 ECI LLC, doing business as 1031 Exchange Coordinators (hereafter "1031 ECI") in Bellevue, Washington. Through 1031 ECI, Defendant engaged in the business of facilitating exchanges of like-kind property under the Internal Revenue Code of the United States. (With a 1031 exchange, a tax payer can postpone paying taxes on the sale of certain investment properties so long as the sale proceeds are properly reinvested into like-kind real property as part of a qualifying exchange. To ensure that all provisions of the Code are followed, tax payers can utilize an exchange facilitator serving as an intermediary who receives the proceeds from the initial sale then facilitates the subsequent closing.)
>
> When hired to serve as an exchange facilitator, Defendant, through 1031 ECI, would enter into written agreements (collectively hereinafter "Facilitator Agreement") with clients who were selling and purchasing real estate as part of a 1031 exchange. Defendant signed Facilitator Agreements in his capacity as President of 1031 ECI. The Facilitator Agreement provided that "[f]unds from closing shall be wired into 1031 Exchange Coordinators [sic] trust account with Bancorp Bank," "[f]unds from closing shall be wired into the trust account specified by 1031 Exchange Coordinators where it will be pooled with other exchange funds under $500,000 unless requested otherwise," or:
>
> Our policies on exchange funds and earnings follow certain state laws and financial institution regulatory requirements. As a result *1031 Exchange Coordinators* has determined to: (I) establish separately identified accounts for exchange funds of $500,000 or more, with the exchanger receiving the interest, if any, from such account; (II) to offer exchanger the option to have exchange funds in the amounts less than $500,000 placed in a pooled account potentially yielding higher interest for exchanger. **Please initial your selection of one of the choices below:**

ORDER
PAGE - 2

          \_\_ 1. For all accounts: A separately identified account with minimal or no earnings;
          Or
          \_\_ 2. For accounts of $500,000 or less: A pooled interest-bearing account with potentially greater earnings;
          Once the exchanger initials one of the above deposit choices, 1031 Exchange Coordinators shall secure such deposit account and notify Exchanger in writing confirming the specific interest that exchanger will receive upon deposit into such account (Interest rates vary over the life of the exchange. The only thing we know at the beginning is the initial interest rate).

The Facilitator Agreement provided that 1031 ECI would be paid a flat fee (typically $500 or $1,000) for the first closing and up to the first three hours of consultation as well as $250 for each closing thereafter. The Facilitator Agreement provided that if additional consulting was required, clients would be billed at a rate of $250 per hour for such consulting, and these fees would be deducted from the funds held by 1031 ECI. In exchange, the Facilitator Agreement provided 1031 ECI would use deposited funds to pay these fees and acquire replacement properties identified by the client or, in the event no replacement properties were acquired, 1031 ECI would return the funds. The Facilitator Agreement did not provide that 1031 ECI would do anything else with deposited funds.

The Facilitator Agreement created the impression that funds deposited by 1031 ECI clients would be secure and available to close exchanges or for repayment in the event no exchanges were completed. Clients who deposited funds with 1031 ECI understood the Facilitator Agreements to obligate 1031 ECI and Defendant to hold their funds during the period between the sale of a relinquished property and the purchase of a replacement property, and ultimately to return funds if no exchange was completed.

In actuality, Defendant did not maintain all the funds deposited by 1031 ECI's clients in trust and he did not intend to do so when he executed the Facilitator Agreements. Rather, Defendant used some of these funds to make investments and transferred some of these funds to non-client non-trust accounts. Defendant did not provide 1031 ECI's clients with written notification of how their funds were invested despite a requirement under state law obligating him to do so of which Defendant was aware.

Included in these investments and transfers, from February through May of 2011, Defendant wired $1,319,000 in funds from 1031 ECI's Bancorp trust account to Brett Amendola. Amendola represented to Defendant that he was developing a golf course and needed what he called "show money" to finalize the project. On behalf of 1031 ECI, Defendant executed a written agreement titled "Irrevocable Trust Agreement" whereby 1031 ECI would transfer funds

to an account where it would remain and serve as Amendola's 'show money' for a few weeks. Amendola represented the account was an escrow account, only Defendant could withdraw funds therefrom, and Defendant could retrieve the funds at any time. In fact, the account provided by Amendola in his wiring instructions was not an escrow account. Instead, Amendola provided a similarly named account and he thereby stole the funds deposited by 1031 ECI. Brett Amendola pled guilty to committing this wire fraud in the Eastern District of Virginia and was sentenced to 84 months in prison.

During his dealings with Amendola and after Amendola failed to return the funds Defendant wired to him, Defendant continued to take on new 1031 ECI clients. Using the Facilitator Agreements, Defendant caused clients L.A., O.S., H. and M.A., F.C., J.H., E.K., W.L., L. and L.S., G. and G.V., and Y.V. to deposit funds totaling in excess of $7,000,000 in 2011. All these funds were initially placed in the same 1031 ECI Bancorp trust account despite a requirement under state law that client funds over $500,000 shall be deposited in separately identified accounts of which Defendant was aware.

During 2011, Defendant became aware of Amendola's fraud. Defendant did not immediately communicate this material fact to all of the then-existing 1031 ECI clients or to subsequent 1031 ECI clients. Given the transfers to Amendola and other investments by 1031 ECI, the balance of funds in 1031 ECI's Bancorp trust account in 2011 was insufficient to fund all 1031 ECI's client's exchanges or repay all 1031 ECI's clients' deposited funds in the event no exchanges were completed. Defendant was aware of this material fact but chose not to disclose it to 1031 ECI clients. Based on this material omission and the representations in the Facilitator Agreements, clients continued to entrust additional funds to Defendant and 1031 ECI throughout 2011. During this time, Defendant intentionally used funds deposited by 1031 ECI clients including L.A., O.S., H. and M.A., F.C., J.H., E.K., W.L., L. and L.S., G. and G.V., and Y.V. to close other clients' exchanges and to repay money to clients who did not finish completing their exchanges as required by the Internal Revenue Code.

For example, by October 6, 2011, 1031 ECI's Bancorp trust account balance was $0, despite the fact that 1031 ECI still then had numerous clients with pending or anticipated exchanges proceeding. On October 17, 2011, Defendant executed a 1031 ECI Facilitator Agreement with F.C. providing his "[f]unds from closing shall be wired into the trust account specified by 1031 Exchange Coordinators where it will be pooled with other exchange funds." Defendant did not disclose material facts to F.C. concerning the funds transferred to Amendola, the balance in the 1031 ECI Bancorp trust account, or the 1031 ECI clients with pending or anticipated exchanges then pending. Based on these material omissions and the representations in the Facilitator Agreement, F.C. conducted an interstate wire transfer of $320,514.40 belonging to F.C. from North Cascades Bank located in

ORDER
PAGE - 4

> Washington, to the 1031 ECI Bancorp trust account in Delaware. Defendant intentionally used these funds to close other 1031 ECI clients' exchanges and make repayments in cases where exchanges were not completed. By December 6, 2011, 1031 ECI's Bancorp trust account balance was $8.63 and F.C. had not yet completed his exchange or received any repayment. When F.C. requested return of the funds he had deposited with 1031 ECI, Defendant told him the funds had been lost.
>
> As a result of this scheme to obtain money by means of material false or fraudulent pretenses, representations, and promises, Defendant fraudulently obtained approximately $3,200,000 in funds deposited by 1031 ECI clients including L.A., O.S., H. and M.A., F.C., J.H., E.K., W.L., L. and L.S., G. and G.V., and Y.V.

Dkt. #6 at 4-7.

In addition, the parties agreed that the following Sentencing Guidelines provisions apply to this case:

    a. A base offense level of seven (7) pursuant to USSG § 2B 1.1 (a)(l).

    b. A sixteen (16) level enhancement pursuant to USSG § 2B 1.1 (b)(1) for a loss amount exceeding $1,500,000.

    c. A two (2) level enhancement pursuant to USSG § 2B 1.1 (b)(2)(a)(i) for involving more than ten victims.

*Id.* at 8.

Petitioner also agreed to pay restitution to the individuals harmed by his criminal conduct, which the government estimated to be approximately $3.2 million at the time. *Id.* at 9.

On February 4, 2016, this Court held Petitioner's sentencing hearing. Dkt. #16. Petitioner was represented by his attorney, Cassandra Stamm, at that hearing. Dkts. #16 and #25. Ms. Stamm argued at the sentencing that Petitioner had not benefitted from the fraud, and that the monies actually went to clients and business-related expenses. Dkt. #25 at 8:1-18. She further argued that any cover up of the fraud was perpetuated by Mr. Amendola, not by Petitioner.

ORDER
PAGE - 5

Dkt. #25 at 8:19-9:2. In addition, Ms. Stamm distinguished Petitioner's actions from those made by people running traditional Ponzi schemes, noting that Petition was working with attorneys during the time period of Mr. Amendola's fraud, and they all believed the money would be coming back and everything would be fixed. *Id.* at 9:24-10:7. After listening to four of the victims speak, as well as Petitioner, the Court ultimately imposed a sentence of 48-months of custody. *Id.* at 42:14-17. Because the parties were not prepared with a final restitution amount at that time, a restitution hearing was set for a later date. *Id.* at 6:11-7:8 and 42:19-43:7.

On September 22, 206, this Court held Petitioner's restitution hearing. Dkt. #44. Petitioner was represented by his new attorney, Jesse Cantor, at that hearing. *Id.* The Court set a restitution amount of $2,767,150.91. *Id.*

On February 2, 2017, Petitioner filed the instant motion arguing that his sentence should be reduced due to ineffective assistance of counsel. The motion is now ripe for review.

### III. DISCUSSION

**A. Standard On Motion Under 28 U.S.C. § 2255**

A motion under 28 U.S.C. § 2255 permits a federal prisoner, in custody, to collaterally challenge his sentence on the grounds that it was imposed in violation of the Constitution or laws of the United States, or that the Court lacked jurisdiction to impose the sentence or that the sentence exceeded the maximum authorized by law. Petitioner challenges his sentence on the grounds that he received ineffective assistance of counsel during his trial. The Court finds that Petitioner is not entitled to an evidentiary hearing in this matter because the Petition, files, and totality of the record conclusively demonstrate that Mr. Dance is not entitled to relief. *See United States v. Howard*, 381 F.3d 873, 877 (9th Cir. 2004).

## B. Standard of Review for Ineffective Assistance Claims

Petitioner argues that his counsel was deficient in three phases of his case: 1) investigating the case prior to the Plea Agreement; 2) responding to the government's sentencing memorandum; and 3) at sentencing. Dkt. #1-1 at 6. Specifically, he asserts that he was denied his right to effective assistance of counsel when:

1. his counsel failed to conduct a competent investigation into the losses attributable to his conduct;

2. his counsel failed to notify him that the loss amount should be the proximate cause and directly foreseeable as a result of his conduct;

3. his counsel failed to respond to the government's new and false allegations contained in the sentencing memorandum;

4. his counsel failed to call a material witness at sentencing;

5. his counsel failed to object to new and false allegations made by the government and in witness testimonies;

6. his counsel failed to allow him to rebut the government's false allegations in his final statement; and

7. the cumulative errors in this case violated his right to effective assistance of counsel.

Dkt. #1-1 at 15-41.

On Reply in support of his motion, Petitioner states that he is "not attacking the sufficiency of the Information or the validity of his plea agreement – just the additional uncharged offenses outside of the stipulated facts, the manner and timing of when they originated, and the material misstatements of the fact [sic] upon which the length of his sentence was determined." Dkt. #15 at 3.

ORDER
PAGE - 7

To establish a claim for ineffective assistance of counsel, Petitioner must prove (1) that counsel's performance was deficient and, (2) that the deficient performance prejudiced the defense. *Strickland v. Washington,* 466 U.S. 668, 687 (1984). In order to establish that counsel's performance was deficient, a petitioner must show that counsel's performance fell below an objective standard of reasonableness. *Id.* at 688. There is a strong presumption that counsel was within the range of reasonable assistance. *Id.* at 689. In order to establish that counsel's performance prejudiced the defense, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

   *1. Grounds One and Two*

On Grounds One and Two of his Petition, Petitioner argues that his counsel failed to conduct a competent investigation into the losses attributable to his conduct, and that his counsel failed to notify him that the loss amount should be the proximate cause and directly foreseeable as a result of his conduct. Dkt. #1-1 at 15-22. More specifically, Petitioner asserts that his counsel was deficient because 1) she failed to ask him what he thought the losses and victims were that resulted from his conduct; 2) she failed to recognize that the $3.2 million loss proposed by the government included the loss attributable to Mr. Amendola's fraud; 3) she failed to interview bankruptcy judge Michael McCarty; 4) had she properly investigated she would have determined that two of the alleged victims were no longer bound by their 1031 agreements and they did not conduct any transactions after the Amendola fraud was discovered; and 5) had she interviewed the lawyers at Beresford Booth she would have been more able to assist Petitioner in presenting

ORDER
PAGE - 8

why Petitioner kept his business operating after the Amendola fraud was discovered. Dkt. #1-1 at 17-19.

The record does not support these assertions. Indeed, prior to pleading guilty, Mr. Dance discussed his concerns with his counsel in an email entitled "Net Amount Lost Calculations." Dkt. #1, Ex. M. That discussion centered on loss amount, and the difference between loss amount and restitution. *Id.* Counsel explained that some loss amounts could possibly be reduced if Mr. Dance could show proof of repayment prior to the time the offense was detected, but that she could not see a way of reducing the entire loss amount below $1.5 million. *Id.* She noted that pleading guilty to any amount between $1.5 and $3.5 million would count the same for sentencing purposes. *Id.* In his plea agreement, Defendant acknowledged that restitution might be lower than the loss amount. Case No. CR15-0349RSM, Dkt. #6 at ¶ 12. Further, in his plea agreement, Mr. Dance conceded that he began misusing employee funds since at least February 2011, that he transferred client funds to Brett Amendola without permission, and that he used client funds for personal investments and to pay off pre-existing clients. *Id.* at ¶ 7.

Mr. Dance complains that his counsel failed to ask him what he thought the losses and victims were that resulted from his conduct. This argument is disingenuous given that he read the Information and agreed to the facts in the plea agreement, so he had full knowledge of what he was pleading to. Further, as discussed above, he had a discussion with his counsel about the loss amount prior to signing that plea agreement. Likewise, Mr. Dance alleges that his counsel was ineffective because she failed to recognize that the $3.2 million loss proposed by the government included the loss attributable to Mr. Amendola's fraud. However, this allegation is completely rebutted by the Information and the plea agreement, which both clearly state that part of Mr. Dance's fraudulent scheme entailed wiring client funds to Mr. Amendola, which were

ORDER
PAGE - 9

then stolen by Mr. Amendola. Similarly, Mr. Dance's argument that P.L., E.K., and G.V.P. would not have constituted victims if counsel had investigated further, is also contradicted by the facts agreed to by Dance in the plea agreement. Again, Mr. Dance specifically pleaded guilty to the facts in the plea agreement supporting their loss amounts.

Mr. Dance then argues that his counsel was deficient because she failed to interview the bankruptcy judge who presided over the bankruptcy of his corporation. Mr. Dance asserts that had she conducted such interview, she would have learned that victim Y.V. received a property out of the bankruptcy that should have been valued at $300,000, which effectively covered her losses, and which should have removed her as a victim for the total loss calculation. Mr. Dance does not support this allegation with any evidence of the property value at the time, or other admissible evidence demonstrating that victim Y.V. had been fully compensated for her loss. Thus, this allegation is speculative and conclusory, and is therefore insufficient to prove that counsel provided ineffective assistance. *Blackledge v. Allison*, 431 U.S. 63, 74, 97 S. Ct. 1621, 52 L. Ed. 2d 136 (1977); *James v. Borg*, 24 F.3d 20, 26 (9th Cir. 1994).

Mr. Dance next argues that his counsel should have interviewed the lawyers at Beresford Booth who assisted him with the attempted recovery of the funds stolen by Mr. Amendola. He asserts that such an interview would have revealed information about why Mr. Dance kept the 1031 ECI business running after he discovered that the funds had been stolen, and would have therefore refuted any allegation that he was running a Ponzi scheme. It is not clear how the information would have changed the calculation of any loss amount in the plea agreement. Mr. Dance appears to suggest that an interview with the Beresford Booth attorneys would have revealed other bank accounts and assets available at the time to cover the $1.3 million lost to Mr. Amendola, such that Mr. Dance was not running a Ponzi scheme to cover those losses. *See* Dkts.

ORDER
PAGE - 10

#1-1 at 19 and #15 at 13-14. However, Mr. Dance fails to address the fact that he signed a plea agreement setting forth specific statements of fact supporting a "scheme" over a lengthy period of time, and that he did take in funds to cover client losses during that period of time. This is significant, as the Ninth Circuit Court of Appeals has explained:

> While this is an issue of first impression in this circuit, it has been raised in three of our sister circuits and they have reached the identical conclusion. In *United States v. Massey*, 48 F.3d 1560, 1566 (10th Cir. 1995), the Tenth Circuit rejected the defendant's argument that "scheme or artifice to defraud" in 18 U.S.C. § 1341 is limited to each individual, defrauded client. The court wrote, "To the contrary, 'scheme to defraud' has a wider meaning than an individual act of fraud. A scheme refers to the overall design to defraud one or many by means of a common plan or technique." *Id*. at 1566. *See also United States v. Morelli*, 169 F.3d 798, 806-07 (3d Cir. 1999) ("We think the money was the proceeds of the entire ongoing fraudulent venture . . . and that this venture was a wire fraud scheme."); *United States v. Tencer*, 107 F.3d 1120, 1131 (5th Cir. 1997) ("Because the money laundering counts do not define 'specified unlawful activity' in terms of the mail fraud activities described in counts 2-18, this court is not limited to considering only those activities.").

*United States v. Rogers*, 321 F.3d 1226 (9th Cir. 2003).

Finally, Mr. Dance argues that his counsel was ineffective because she failed to inform him about the law governing the calculation of loss amounts. Dkt. #1-1 at 20-22. Specifically, Mr. Dance asserts that he was not aware of a case that held a defendant can only be required to pay restitution for amounts that were "directly" and "foreseeable" from his criminal conduct. *Id.* Mr. Dance asserts that he never would have pleaded guilty to a "general" loss amount of $3.2 million if he had been aware of that case prior to his plea. *Id.* As discussed above, Mr. Dance's counsel attempted to explain to him the difference between loss and restitution amounts, which are different. Moreover, Mr. Dance himself provides email correspondence between his counsel and the government discussing restitution amounts in light of the case of which Mr. Dance now asserts he was unaware; thus, even if counsel did not communicate to Mr. Dance the specific

ORDER
PAGE - 11

case law that informed the calculation in the plea, it is clear that his counsel was aware of the standard for calculating restitution and actively negotiating with the government based on that standard. The Court is not aware of any legal authority, and Mr. Dance has offered none, that requires counsel to provide clients with specific case citations in order to be effective.

When determining whether the degree of investigation conducted by defense counsel is reasonable, the Supreme Court has held that:

> [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.

*Strickland*, 466 U.S. at 690-691. For the reasons discussed above, Mr. Dance has failed to demonstrate that his counsel's investigation was deficient, or that the strategic choices made with respect to the plea agreement were made after any inadequate investigation. As a result, Mr. Dance's Petition on Grounds One and Two fails.

*2. Ground Three*

Mr. Dance next argues that his counsel was deficient when she failed to respond to ten "new and false" allegations contained in the government's sentencing memorandum. Dkt. #10-1 at 23-35. This claim primarily focuses on the victim loss calculation, and the government's characterization of his various actions. *Id.* Having reviewed Mr. Dance's arguments, and the plea agreement in this matter, the Court agrees with the government that Mr. Dance fails to establish that these allegedly "new and false" allegations were actually false, or that they had a material impact on sentencing.

As an initial matter, the Court notes that several of these "new and false" statements, are simply recitations of facts set forth in the plea agreement. For example, Mr. Dance objects to the following:

> (1) "Had Mr. Dance reported the Amendola fraud immediately and not engaged in the repayment scheme, his client losses would have amounted to $1,319,000. Instead, Mr. Dance's actions to fraudulently cover up his misuse of the funds led to a much steeper loss of over $3,200,000."
>
> (2) ". . . [Dance's] cover-up…directly caused a multiplication in the damage to his clients, leaving many more victims in its wake."
>
> (3) "Mr. Dance soon became unable to repay clients and closed the business, leaving clients L.A., O.S., H. and M.A., F.C., J.H., E.K., W.L., L. and L.S., G. and G.V., and Y.V. with losses exceeding $3,200,000."

Dkt. #1-1 at 23-26. The plea agreement states that "from February through May of 2011, Defendant wired $1,319,000 in funds from 1031 ECI's Bancorp trust account to Brett Amendola . . .", and that, as a result, "the balance of funds in 1031 ECI's Bancorp trust account in 2011 was insufficient to fund all 1031 ECI's client's exchanges or repay all 1031 ECI's clients deposited funds in the event no exchanges were completed." Case No. CR15-0349RSM, Dkt. #6 at ¶ 7. The stipulated facts then conclude: "[a]s a result of this scheme to obtain money by means of material false or fraudulent pretenses, representations, and promises, Defendant fraudulently obtained approximately $3,200,000 in funds deposited by 1031 ECI clients including L.A., O.S., H. and M.A., F.C., J.H., E.K., W.L., L. and L.S., G. and G.V., and Y.V." *Id*. Thus, none of these three statements can be characterized as "new" or "false."

Mr. Dance then objects to the characterization of his conduct as a Ponzi scheme. Dkt. #1-1 at 27. Mr. Dance specifically objects to the statement in the government's sentencing memorandum that, "[t]o avoid having to disclose the significant loss arising from the Amendola investment, Mr. Dance eventually turned to using incoming client funds to pay back pre-existing

ORDER
PAGE - 13

clients whose funds he had lost through these unauthorized investments. This repayment scheme could not sustain itself, as it relied upon a steady stream of new clients with sufficient funds to finance numerous pre-existing obligations." Dkt. #1-1 at 27. Likewise, Mr. Dance objects to the statement that, "[r]ather than coming clean to his clients and/or reporting Mr. Amendola to the authorities, Mr. Dance chose to run his business as a Ponzi scheme." *Id.*

While Mr. Dance may object to the term "Ponzi scheme," he pleaded guilty to "intentionally us[ing] funds deposited by 1031 ECI clients...to close other clients' exchanges and to repay money to clients who did not finish completing their exchanges as required by the Internal Revenue Code." Case No. CR15-0349RSM, Dkt. #6 at ¶ 7. The actions of paying existing clients with funds from new clients, is analogous to the classic definition of a Ponzi scheme, which is "commonly used to refer to a fraudulent investment scheme in which early investors are paid with sums obtained from later ones." *United States v. Ruskjer*, 2011 U.S. Dist. LEXIS 96902 (D. Haw. Aug. 29, 2011), *See Black's Law Dictionary* 1198 (8th ed. 2004); *Donell v. Kowell*, 533 F.3d 762, 767 n.2 (9th Cir. 2008); *United States v. Behrens*, 2009 U.S. Dist. LEXIS 124741, 2010 WL 427784, at *3 (D. Neb. 2010) ("A 'Ponzi scheme' is merely a lay-term used to describe a variety of fraud."). Further, as noted above, Ms. Stamm distinguished Petitioner's actions from those made by people running traditional Ponzi schemes, noting that Petition was working with attorneys during the time period of Mr. Amendola's fraud, and they all believed the money would be coming back and everything would be fixed. *Id.* at 9:24-10:7. Thus, Plaintiff cannot demonstrate that these statements were "false," or that there would have been any different outcome if his counsel had objected to the government's terminology.

Mr. Dance also asserts that his counsel should have objected to the way that the government characterized his intent. Specifically, he objects to the following statements:

ORDER
PAGE - 14

> Mr. Dance appears to have believed that he could place client funds under his safekeeping into an outside escrow account, receive kickbacks from Mr. Amendola for doing so and then move the funds back to the 1031 ECI trust account, all without notifying any 1031 ECI client about this conduct, and presumably with the goal that no client would ever realize that their funds had been transferred.
>
> Thus, while Mr. Dance did not initially intend to lose or steal his client's funds, he did intend to personally benefit from the payments that Mr. Amendola made, and indeed received the payments from Mr. Amendola in the 1031 ECI operating account at Frontier/Union bank.
>
> This personal benefit appears to be what drove Mr. Dance to invest client funds in an unauthorized manner. Though Mr. Dance may have thought his investment with Mr. Amendola was fairly safe, and therefore a reasonable risk, this calculation was not his to make as the funds belonged to his clients.

Dkt. #1-1 at 28-29. Mr. Dance argues that he did not receive "kickbacks" from Mr. Amendola, that he did not intend to benefit from the payments made to Mr. Amendola, and that it was his right to invest funds with an escrow account according to accepted custom and practice. *Id.*

Again, even though Mr. Dance objects to the government's characterization of his intent, he fails to demonstrate that there would have been a different outcome had his counsel objected. In the plea agreement, Mr. Dance agreed that "[i]n actuality, Defendant did not maintain all the funds deposited by 1031 ECI's clients in trust and he did not intend to do so when he executed the Facilitator Agreements. Rather, Defendant used some of these funds to make investments and transferred some of these funds to non-client non-trust accounts." Case No. CR15-0349RSM, Dkt. #6 at ¶ 7. Moreover, the Information to which Mr. Dance pleaded guilty charged that the scheme to defraud was premised on Mr. Dance intending to "use the funds that he obtained as a result of the scheme to fund personal investments and to repay other clients." Case No. CR15-0349RSM, Dkt. #1. There is no authority precluding the government from drawing inferences from the facts in these documents to make its arguments to the Court with respect to sentencing.

ORDER
PAGE - 15

Finally, Mr. Dance objects to the government arguing that "many of the victims in this case still suffered a financial catastrophe…", and "[r]ather than closing the business at the time, or notifying incoming clients of the risks, Mr. Dance proceeded with business as usual." Dkt. #1-1 at 30-32. Mr. Dance essentially argues that some of his victims had other assets worth far more that their losses, so that they did not in fact suffer a "catastrophe." Specifically, he points to H.A., M.A., Y.V. and G.V.P. Dkt. #1-1 at 31. Mr. Dance also argues that he conducted "business as usual" because he had other accounts and assets to cover the initial loss to Mr. Amendola, which allowed him to continue his business. *Id.* at 31-32.

Mr. Dance may not choose to use the word "catastrophe" to describe what his victims suffered. However, he has failed to provide any legal authority precluding the government from using such a descriptor. Moreover, he fails to demonstrate that any objection by his counsel to the use of that word would have resulted in any outcome. The same is true for the use of the phrase "business as usual."

For all of these reasons, Mr. Dance has failed to demonstrate that his counsel's failure to object to these ten statements in the government's sentencing memorandum was ineffective. As a result, Mr. Dance's Petition on Ground Three fails.

3. *Grounds Four, Five and Six*

Mr. Dance next argues that his counsel was deficient at the sentencing stage, when his counsel: 1) failed to call a material witness at sentencing; 2) failed to object to new and false allegations made by the government and by witnesses; and 3) failed to allow him in his final statement to the Court to rebut the government's false allegations. Dkt. #1-1 at 35. Specifically, Mr. Dance argues that his counsel should have presented his son Jeffrey Dance as a witness, that counsel should have presented rebuttal evidence to Mr. Asmussen's assertion that stress from the

ORDER
PAGE - 16

financial loss led to his wife's death, that counsel should have objected to the government characterizing his actions as "stealing directly" from his clients, and that counsel should have allowed him to rebut the government's statements in order to provide the court with "meaningful information" about his clients' net worth in comparison with their losses. *Id.* at 36-39.

As the government noted, Mr. Dance bears the burden of proving both that his attorneys' decisions fell "outside the wide range of professionally competent assistance" and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 690, 694. The Court agrees that the strategic decisions presented by Mr. Dance demonstrate neither.

Mr. Dance asserts that his counsel called no witnesses and directed him to remain quiet. Yet the record demonstrates that a friend of Mr. Dance did speak at sentencing, and Mr. Dance also spoke on his own behalf. Case No. CR15-0349RSM, Dkt. #25 at 14-22 and 33-36. With respect to Mr. Dance's complaint that his son was not allowed to speak at his sentencing, Mr. Dance fails to demonstrate what information his son would have provided or how that would have materially changed the outcome of the proceedings. Indeed, counsel apparently conveyed to Mr. Dance that his son did not need to testify because he would not present any new information. Dkt. #1-1, Ex. A at ¶ 13. Jeffrey Dance presents a Declaration in which he discusses his observations of his father and his father's business, but does not convey any personal knowledge of the various actions taken by his father or his father's clients' investments. *See* Dkt. #1-1, Ex. C. Mere speculation that a witness speaking on his behalf might have swayed the outcome is speculative, and therefore does not establish prejudice. *See Gonzalez v. Knowles*, 515 F.3d 1006, 1015-16 (9th Cir. 2008).

ORDER
PAGE - 17

Further, counsel does not have a duty to present evidence that might elicit "aggravating" information that could hurt the defendant's case. *See Fairbank v. Ayers*, 650 F.3d 1243, 1252–53 (9th Cir. 2011) (explaining that it is not ineffective assistance to decline to call a witness who might open the door to aggravating evidence). Allowing Mr. Dance to present information about his clients and their finances could have appeared as disparaging, and could have ultimately damaged the Court's view of his character. Thus, defense counsel made a reasonable strategic decision not to introduce the potentially harmful evidence that Mr. Dance now contends should have been presented.

Next, while Mr. Dance objects to one of the witness statements about the cause of his wife's death, the Court did not sentence Mr. Dance for causing the death of Mrs. Asmussen. The Court expressed its condolences to Mr. Asmussen, but there is no indication in the record that the Court used her death as a factor in the actual term of Mr. Dance's sentence. *See* Case No. CR15-0349RSM, Dkt. #25. Likewise, Mr. Dance provides no legal authority to indicate that victims are required to make a showing of their financial net worth in order to establish they were harmed by a fraud scheme, and therefore the Court agrees with the government that there is no basis to argue that his counsel "made errors that a reasonably competent attorney acting as a diligent and conscious advocate would not have made." *Butcher v. Marquez*, 758 F.2d 373, 376 (9th Cir. 1985).

Finally, the Court is not persuaded that Mr. Dance's counsel was deficient because she allegedly directed Mr. Dance not to respond to what Mr. Dance believed were false allegations. Mr. Dance was able to speak to the Court during sentencing. Case No. CR15-0349RSM, Dkt. #25. There is nothing on the record demonstrating that he was precluded from saying what he wanted to say to the Judge at that time. *Id.* For all of these reasons, Mr. Dance has failed to

ORDER
PAGE - 18

demonstrate that his counsel was ineffective during the sentencing phase. As a result, Mr. Dance's Petition on Grounds Four, Five and Six fails.

   4. *Ground Seven*

Finally, Mr. Dance argues that theses alleged errors, cumulatively, require that his motion be granted and that he be re-sentenced. Dkt. #1-1 at 40-41. Because the Court has determined that there were no errors with respect to counsel's performance at any stage of the proceedings, the Court denies any claim of cumulative error.

**C. Motion to Appoint Counsel**

Petitioner has also renewed a prior Motion to Appoint Counsel. Dkts. #2 and #14. In his current motion, Petitioner states, as he did previously, that he is seeking counsel to assist with his habeas petition because he is untrained in the law, he is in custody, and he believes his claims are meritorious. *Id.* In a case brought under 28 U.S.C. § 2255, a district court may appoint counsel in the "interest of justice". 18 U.S.C. § 3006A(a)(2)(B); *Weygandt v. Look*, 718 F.2d 952, 954 (9th Cir. 1983). "In deciding whether to appoint counsel in a habeas proceeding, the district court must evaluate the likelihood of success on the merits as well as the ability of the petitioner to articulate his claims *pro se* in light of the complexity of the legal issues involved." *Weygandt*, 718 F.2d at 954. The Court does not find that justice requires the appointment of counsel at this time. First, the issues presented in Mr. Dance's motion are not particularly complex. *See* Dkt. #1-1 (alleging several bases for his claim of ineffective assistance of counsel). Second, the Court has determined that his claims lack merit. Accordingly, Petitioner's Motion to Appoint Counsel (Dkt. #14) will be denied.

///

///

## IV. CONCLUSION

Having reviewed Petitioner's motion, the opposition thereto and reply in support thereof, along with the supporting Declarations and Exhibits and the remainder of the record, the Court does hereby find and ORDER:

1. Petitioner's Motion to Vacate Sentence (Dkt. #1) is DENIED.

2. Petitioner's Motion to Appoint Counsel (Dkt. #14) is DENIED.

DATED this 15 day of August, 2017.

RICARDO S. MARTINEZ
CHIEF UNITED STATES DISTRICT JUDGE